

# HINSHAW

& CULBERTSON LLP

July 27, 2006

ATTORNEYS AT LAW
222 North LaSalle Street
Suite 300
Chicago, IL 60601-1081

312-704-3000
312-704-3001 (fax)
www.hinshawlaw.com

**VIA FACSIMILE (716-937-7735)**
**AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Gerald J. Sanok
P.O. Box 68
Alden, NY 14004-0068

Dear Mr. Sanok:

We represent Drummond American Corporation. ("Drummond") and are writing to you on its behalf.

In connection with your termination from Drummond, which was effective June 27, 2006, you were reminded of your continuing contractual commitments to Drummond under your Independent Sales Agent Agreement dated June 28, 1982. On June 12, 2006 you were given another copy of that Agreement as well as a letter detailing your post-termination obligations. That letter and your contract are enclosed.

Drummond has been advised that you are now employed by or otherwise associated with Continental Research, a direct competitor of Drummond.

On behalf of Drummond, we remind you that, under the terms of your contract, you are prohibited for two (2) years, through June 27, 2008, from soliciting purchases of products competitive to Drummond's from, and selling products competitive to Drummond's to, those Drummond customers you solicited or sold to during the year prior to your termination. In addition, you are prohibited at all times from using or disclosing any of Drummond's customer and other confidential information on behalf of yourself or any other person or entity, including Continental Research. You also agreed in your contract with Drummond that you would not at any time induce, cause or encourage any other agent or employee of Drummond to leave Drummond and compete with Drummond or breach a contract with Drummond.



EXHIBIT

A

Arizona  California  Florida  Illinois  Indiana  Minnesota  Missouri  New York  Oregon  Wisconsin

Gerald J. Sanok
July 27, 2006
Page 2

Drummond expects that you will comply in all respects with the terms and conditions of your contract with Drummond. If you fail to do so, Drummond will take all appropriate actions to enforce its contractual rights and protect its business interests.

Sincerely,

HINSHAW & CULBERTSON LLP

Alan I. Greene
Direct 312-704-3536
agreene@hinshawlaw.com

AIG:pj
Enclosures

cc:   N. Vassallo (via e-mail)
      Tom Epstein, Continental Research (via fax and Certified Mail, Return Receipt Requested)

6043033v1 852801

## AGREEMENT WITH INDEPENDENT
## SALES AGENT

THIS AGREEMENT is made and entered into at Elk Grove Village, Illinois this __28th__ day of __June__ , 19 __82__ , by and between Drummond American Corporation (COMPANY), a corporation of Illinois and _____ Gerald J. Sanok_____ , independent agent (AGENT).

COMPANY is engaged in the sale and distribution of disinfectants, deodorants, soaps, detergents, cleaners, hand cleaners, paints, insecticides, chemical specialties, maintenance chemicals, degreasers, and floor maintenance materials and equipment as well as related products, materials and equipment.

COMPANY sells the products it distributes through independent sales agents who solicit orders subject to COMPANY'S acceptance and maintain frequent contacts for said purpose with customers.

AGENT has made application to COMPANY to become an independent sales agent and COMPANY desires to appoint AGENT as its independent sales representative.

NOW THEREFORE, in consideration of the mutual agreements and undertakings herein set forth, it is agreed as follows:

1.   (a)    COMPANY hereby appoints AGENT as its Independent Sales Representative upon the terms set forth herein in the territory described in Exhibit 'A' made a part hereof and AGENT hereby accepts such appointment.

       (b)    All orders solicited by AGENT shall be forwarded to COMPANY by AGENT and are subject to acceptance by COMPANY at COMPANY'S office.

       (c)    AGENT shall be paid a commission on orders accepted by COMPANY at rates fixed by COMPANY currently in effect at the time of receipt and acceptance of each order by COMPANY. Commissions shall be paid in accordance with COMPANY'S compensation schedule in effect from time to time but not less frequently than semi-monthly, based upon orders shipped and billed to the customer up to 14 days prior to the payment date, subject to any deductions which are shown on his statement for uncollected items, chargebacks, returned merchandise or any other obligations initiated by AGENT. COMPANY shall be entitled to change said payment schedule as may be desired from time to time.

       (d)    All expenses of AGENT for travel, transportation, use of facilities or equipment and all other expenses of every nature shall be paid by AGENT without reimbursement by COMPANY.

       (e)    AGENT shall carry, at his own expense, public liability insurance in limits of liability of not less than the following:
property damage $100,000; bodily injury in limits of $250,000/$500,000 in connection with the use of any vehicle used by AGENT in connection with his work under this Agreement, and shall furnish COMPANY with a certificate of such insurance, designating COMPANY as an additional insured which shall not be subject to cancellation without giving COMPANY 30 days prior written notice, except for non-payment of premium.

2.   COMPANY has loaned to AGENT a Sales Kit, Manuals, Samples, and other Materials, Merchandise and Advertising Matter solely for AGENT'S use on behalf of COMPANY and which shall remain the property of COMPANY and shall be returned to COMPANY by AGENT immediately upon the termination of his affiliation with COMPANY.

AGENT further agrees that the final statement of his account shall be postponed until after such time as all of the above items are returned to COMPANY. Further, COMPANY shall have the right to retain the sum of $300.00 upon termination of this Agreement and until AGENT has returned all items or property of COMPANY and complied with all other conditions provided for herein.

AGENT hereby acknowledges that the said materials furnished him by COMPANY, or received by AGENT during his affiliation with the COMPANY, and all Catalogs, Prospect Lists, Customer Lists, Customer Information and other information, and the instruction and tutelage which he has and will from time to time receive while affiliated with company are of great value to COMPANY and will be to AGENT, and if misused by AGENT or used or allowed to be used by AGENT for or on behalf of a competitor of COMPANY would cause COMPANY irreparable loss and damage, the extent of which will be substantial but may not be readily capable of determination. The business of COMPANY is established, maintained and continued by providing for customers a dependable source of supply of the products it distributes by means of frequent calling upon customers by its independent sales agents. Said sales agents are COMPANY'S only personal contact with customers and prospective customers.


EXHIBIT
B

Accordingly, in consideration of COMPANY'S engaging him as an INDEPENDENT AGENT under this Agreement, AGENT hereby agrees as follows:

(a)    During the term of his Agency and for a period of Two (2) Years following termination thereof whether by himself or by COMPANY, for whatever reason and whether for cause or without cause, he shall not, directly or indirectly, for or on behalf of himself or any company or firm in which he has an interest or in which any member of his family has an interest, solicit orders from customers or sell products competitive to those sold by COMPANY to any customer that he solicited or sold on behalf of COMPANY during the last 12 months of his relationship with COMPANY.

(b)    AGENT shall not, at any time, or in any place, territory or location, disclose to any person, firm, association or corporation other than COMPANY, the names of any other information concerning any of the customers that he solicited or sold during his relationship with COMPANY or the names of which were furnished to him by COMPANY for such purpose.

(c)    AGENT shall not, at any time or in any place, disclose to any person, firm or corporation, or permit any of the same to be copied, or in any manner furnish or otherwise make use of the Sales Kit, Manuals, Samples or any other Materials, Merchandise or Advertising Matter furnished him by COMPANY or received by him from COMPANY except as is necessary and appropriate to the solicitation of orders for COMPANY.

(d)    During the term hereof and at all times thereafter, AGENT shall not disclose to any person, firm or corporation other than COMPANY any trade information, techniques or other confidential information of the business of COMPANY, its methods of doing business or any information concerning its customers learned or acquired by AGENT during his relationship with COMPANY and shall not engage in any unfair trade practices with respect to COMPANY.

4.    AGENT agrees that in the event of his breach or violation or attempted breach or violation of any of the above provisions, said provisions, or any of them, maybe enforced by an injunction in a suit in equity, and that a temporary or preliminary injunction or restraining order may be granted immediately upon the commencement of any such suit and without notice.

5.    (a)    This Agreement shall remain in effect until terminated as hereinafter provided. Either party shall have the right at any time to terminate this Agreement by giving fifteen (15) days prior written notice thereof to the other party.

(b)    COMPANY may cancel and terminate this Agreement by giving two (2) days written notice in the event AGENT shall violate any material provisions of this Agreement which could result in damage to COMPANY or its customer relations or in the event he shall have induced COMPANY to enter into this Agreement by the concealment of material fact or by a material misrepresentation, or in the event he shall cease to function on behalf of COMPANY under the terms hereof, or a receiver shall be appointed for him or for his property, or a petition in bankruptcy or for reorganization or for an arrangement shall be filed by or against him or he shall make an assignment for the benefit of creditors. AGENT upon like notice may terminate this Agreement in the event COMPANY shall without legal justification refuse to pay commissions to AGENT. AGENT shall comply promptly with COMPANY'S reasonable requests for information required by the Internal Revenue Service or any other governmental agencies.

(c)    Upon termination of this Agreement, both parties shall be released and relieved of all future liability hereunder, except that:

(i)    AGENT shall immediately return to COMPANY all property described in Paragraph 2 hereof.

(ii)    AGENT shall forthwith pay to COMPANY the excess of any and all advances made to him over and above the amount of commission due and owing to him.

(iii)    COMPANY shall pay AGENT for the excess, if any, of commission due him over advances or other charges due from AGENT.

(iv)    AGENT shall remain bound by the provisions of Paragraph 2, 3, 4 and 5(c) hereof.

6.    This Agreement shall be construed, interpreted and performed in accordance with the laws of the State of Illinois.

7.  It is intended and agreed by and between the parties hereto that AGENT is and shall at all times pertinent hereto be and remain an independent contractor. This agreement is for personal services and shall not be assigned by AGENT without COMPANY'S written consent being first obtained. In the event AGENT shall desire to conduct the business of soliciting orders for the sale of COMPANY'S products through and in the name of a corporation to be organized by AGENT ("Corporation") and with respect to which Corporation, AGENT, or AGENT and his spouse will be the sole shareholders, upon reasonable prior written notice to COMPANY, COMPANY will thereupon enter into a new agreement with AGENT substantially in the form hereof which shall contain such additional provisions as may be required to conform to this paragraph 7, and if required by COMPANY, AGENT'S guaranties of performance by Corporation of its undertakings to COMPANY.

8.  All of the covenants and provisions herein contained are severable. In the event that any of said covenants or provisions shall be held invalid by any court of competent jurisdiction, this Agreement shall be construed as if such invalid covenant or provision were not herein contained. The failure to enforce any provision shall not be construed as a waiver of that right or of any other provision or right.

9.  The use of any pronoun herein in the singular or masculine form shall be deemed to include the plural, feminine or neuter form wherever the context would so require.

10. This instrument supersedes all previous agreements between the parties and contains the entire agreement between them, and it is expressly agreed that no representations, promises, conditions, warranties or understandings, either expressed or implied, other than herein set forth, shall be binding upon either party, and that none of the provisions of this Agreement shall be waived, altered, or amended, except by writing signed by the President, Vice President, Secretary, Treasurer, or Director of Sales of COMPANY on the one hand and by the AGENT on the other.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

COMPANY:

DRUMMOND AMERICAN CORPORATION

By: _____

Its    Executive Vice President - Sales

_____
(Independent Agent)

_____
(Address)

NOTE: *See Exhibit 'A', reverse side this page.*

## EXHIBIT "A"

In accordance with Paragraph 1.(a) of the foregoing sales agreement the territory of ___Gerald J. Sanok___

(Independent Agent)

will be as follows:

State(s)    New York

Counties    Erie, Wyoming And Genesee Counties

Exceptions:    Any account assigned to other Drummond American agents
shall not be part of the above territory.

Effective: _June 28, 1982_

This assignment supersedes any and all previous assignments and all amendments and supplements thereto.

DRUMMOND AMERICAN CORPORATION

BY: _____

(Independent Agent)



## DRUMMOND AMERICAN CORPORATION
### INDEPENDENT SALES AGENT'S SECURITY BONUS PROGRAM

I.  **Qualifications for Participation.**
A.  Representing Company as an Independent Sales Agent ("Agent") for three (3) full, consecutive, calendar years.
B.  Total Net Business previous three (3) consecutive, calendar years must aggregate $300,000.00 plus.
C.  Net business for two (2) of the three (3) consecutive, calendar years counted must exceed $100,000.00 net volume.

The above qualifications are the only ones required for participating in this Program.

II.  **The Reward - Continuing Qualification.**
A.  Company will reward the Agent by way of a deferred bonus equaling four percent (4%) of annual net commissions in the manner and subject to the terms explained herein. The reward will commence once the three (3) qualifying requirements have been met. Thereafter, the Company will establish a bonus account for Agent and will credit the account with four percent (4%) of the net commissions paid to Agent with respect to the third calendar year. Subsequently, credits to Agent's bonus account will be made by the Company for each full, calendar year of participation thereafter based upon commissions paid to Agent for that year, provided Agent has represented Company for the entire calendar year, and Agent continues to write the correct minimum volume of net business required by the company under the Program. Following the end of each calendar year and before any reward is made for that year, if any, interest will be credited against the then vested portion of Agent's bonus account. Interest shall be computed at a rate equal to the average of the one year U.S. Treasury Bill rates in effect as of the 1st day of each calendar quarter during that year.
B.  If Agent, after becoming a participant, fails to meet the minimum requirements for three (3) consecutive calendar years, his or her participation in the Program will be discontinued. However, Agent will retain an interest in the then vested portion of those amounts previously credited to his or her bonus account.

III.  **Payment of Reward.**
A.  **Normal Payment.** Subject to Section IV, the full amount credited to Agent's bonus account is normally payable to Agent or his or her designated beneficiary following termination of the agency relationship after twenty (20) consecutive, calendar years of participation in the Program. Any Agent continuing in the agency relationship thereafter and continuing as a participant will continue in the Program and subject to Section IV, be fully vested.
B.  **Payment - Less than Full Term.** Subject to Section IV, the Agent or his or her designated beneficiary, may obtain the vested amount credited to his or her bonus account before the expiration of twenty (20) consecutive, calendar years of participation in the Program only under the following circumstances and in the following amounts:
(i)  In the event of death or in the event of total and permanent disability: at any time after qualifying, the entire amount then credited to his or her bonus account.
(ii)  In the event of termination of agency, either by Agent or by Company for any reason:
(a)  less than five (5) full, consecutive, calendar years of participation in the Program: zero percent of the amount then credited to his or her bonus account;
(b)  following completion of five (5) full, consecutive, calendar years' participation in the Program: twenty-five percent (25%) of the amount credited to his or her bonus account;
(c)  for each full, calendar year's participation in the Program thereafter, five percent (5%) additional (i.e. 6 years, 30%; 7 years, 35%; 10 years, 50%; and 20 years, 100%).
(iii)  In the event age 65 is reached by the Agent and the agency is thereafter terminated by either party for any reason before completing twenty (20) years of participation in the Program:
(a)  Until completion of ten (10) years of participation in the Program, regular schedule will apply (i.e. 25% after five (5) years participation, etc.).
(b)  After completion of not less than ten (10) years participation in the Program, the entire amount then credited to Agent's bonus account will become payable.

IV.  **Forfeiture of Reward.**
A.  In the event of termination of the agency relationship by either party for any reason when participation in the Program is less than five (5) full, consecutive, calendar years, or in the event of termination of the agency relationship at any time (regardless of length of participation in the Program) for conduct inimical to the best interests of Company: Zero percent of amounts credited to his or her bonus account shall be payable to Agent or his or her beneficiary and the entire amount credited to the bonus account shall be forfeited.
B.  In the event of termination of the agency relationship, for any reason and at any time, any amounts credited to Agent's bonus account not payable hereunder shall be forfeited.

V.  **Method of Payment.**
Payment by the company will be in a lump sum. All payments to participants from the security bonus plan are taxable as ordinary income for the year in which payment is made. Payments from the security bonus plan DO NOT qualify for tax-deferred roll over to an individual retirement account (IRA) or any other qualified retirement plan.

VI.  **Voluntary Program - Reserved Rights.**
This is a voluntary program on the part of the Company in an effort to give you and your family peace of mind and security for the future and to provide you with the finest agency relationship in the industry. To the best of our knowledge, this program has never been attempted in our industry (or any other) for the benefit of independent sales agents and therefore, Company reserves the right to withdraw or modify this Program at any future date in the event Company deems it appropriate, or if requested by any duly constituted body or agency of the United States or any state or local government. However, if any of these events should take place, reasonable notice would be given by Company to all participants, and any vested amounts then reflected in Agent's bonus account would be paid in accordance with the terms of payment under the Program.

EXHIBIT
C

# SALES AGENTS' SECURITY BONUS PROGRAM - 2005

The following is a statement of your activity and interest
on vested balances in the Security Bonus Program for the year ended
December 31, 2005:

| | |
|---|---|
| PARTICIPANT | *GERALD SANOK* |
| COMPANY NUMBER | 7 |
| REGION NUMBER | 45 |
| YEAR ENTERED INTO PROGRAM | 1985 |
| BALANCE AS OF 12-31-04 | 80,775.41 |
| VESTED PORTION AS OF 12-31-04 | 80,775.41 |
| INTEREST ON VESTED PORTION AS OF 12-31-04 (3.43%) | 2,770.60 |
| 2005 NET COMMISSIONS | 138,045.24 |
| COMPANY CONTRIBUTION AT 4% | 5,521.81 |
| BALANCE AS OF 12-31-05 | 89,067.81 |
| YEARS OF PROGRAM PARTICIPATION | 21 |
| PERCENT VESTED | 100% |
| VESTED PORTION OF 12-31-05 BALANCE | $89,067.81 |


EXHIBIT
D

# HINSHAW

**& · C U L B E R T S O N   L L P**

July 27, 2006

ATTORNEYS AT LAW
222 North LaSalle Street
Suite 300
Chicago, IL 60601-1081

312-704-3000
312-704-3001 (fax)
www.hinshawlaw.com

**VIA FACSIMILE (812-331-7612)**
**AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

J. Richard Steele
4011 Morningside Drive
Bloomington, IN 47408-3128

Dear Mr. Steele:

We represent Drummond American Corporation. ("Drummond") and are writing to you on its behalf.

In connection with your termination from Drummond, which was effective June 27, 2006, you were reminded of your continuing contractual commitments to Drummond under your Independent Sales Agent Agreement dated April 1, 1982. On June 12, 2006 you were given another copy of that Agreement as well as a letter detailing your post-termination obligations. That letter and your contract are enclosed.

It is Drummond's understanding that you have breached the terms of your contract by soliciting at least one customer with which you dealt on behalf of Drummond. Specifically, Drummond has learned that on behalf of Continental Research, a direct competitor of Drummond, you called on 4 Winds Marina in Bloomington, Indiana.

On behalf of Drummond, demand is hereby made that you immediately cease and desist all activities in violation of your contract, and in all respects comply with the terms and conditions of your contract with Drummond. If you fail to do so, Drummond will take all appropriate actions to enforce its rights under the Agreement and to protect its business interests.

Sincerely,

HINSHAW & CULBERTSON LLP

Alan I. Greene
Direct 312-704-3536
agreene@hinshawlaw.com

AIG:pj
Enclosures
cc:   N. Vassallo (via e-mail)
      Tom Epstein, Continental Research (via fax and Certified Mail, Return Receipt Requested)

**EXHIBIT**
E

Arizona  California  Florida  Illinois  Indiana  Minnesota  Missouri  New York  Oregon  Wisconsin

JUN-05-2006  09:58    HRD    847 8.    P.02-05

## AGREEMENT WITH INDEPENDENT
## SALES AGENT

THIS AGREEMENT is made and entered into at Elk Grove Village, Illinois this ___1st___ day of ___April___, 19 _82_ by and between Drummond American Corporation (COMPANY) a corporation of Illinois and _____ J. Richard Steele _____, independent agent (AGENT).

COMPANY is engaged in the sale and distribution of disinfectants, deodorants, soaps, detergents, cleaners, hand cleaners, paints, insecticides, chemical specialties, maintenance chemicals, degreasers, and floor maintenance materials and equipment as well as related products, materials and equipment.

COMPANY sells the products it distributes through independent sales agents who solicit orders subject to COMPANY'S acceptance and maintain frequent contacts for said purpose with customers.

AGENT has made application to COMPANY to become an independent sales agent and COMPANY desires to appoint AGENT as its independent sales representative

NOW THEREFORE, in consideration of the mutual agreements and undertakings herein set forth it is agreed as follows:

1.  (a)  COMPANY hereby appoints AGENT as its Independent Sales Representative upon the terms set forth herein in the territory described in Exhibit 'A' made a part hereof and AGENT hereby accepts such appointment

    (b)  All orders solicited by AGENT shall be forwarded to COMPANY by AGENT and are subject to acceptance by COMPANY at COMPANY'S office.

    (c)  AGENT shall be paid a commission on orders accepted by COMPANY at rates fixed by COMPANY currently in effect at the time of receipt and acceptance of each order by COMPANY. Commissions shall be paid in accordance with COMPANY'S compensation schedule in effect from time to time but not less frequently than semi-monthly, based upon orders shipped and billed to the customer up to 14 days prior to the payment date, subject to any deductions which are shown on his statement for uncollected items, chargebacks, returned merchandise or any other obligations initiated by AGENT. COMPANY shall be entitled to change said payment schedule as may be desired from time to time.

    (d)  All expenses of AGENT for travel, transportation, use of facilities or equipment and all other expenses of every nature shall be paid by AGENT without reimbursement by COMPANY

    (e)  AGENT shall carry, at his own expense, public liability insurance in limits of liability of not less than the following:
    property damage $100,000 bodily injury in limits of $250,000/$500,000 in connection with the use of any vehicle used by AGENT in connection with his work under this Agreement, and shall furnish COMPANY with a certificate of such insurance, designating COMPANY as an additional insured which shall not be subject to cancellation without giving COMPANY 30 days prior written notice except for non-payment of premium

2.  COMPANY has loaned to AGENT a Sales Kit, Manuals, Samples, and other Materials, Merchandise and Advertising Matter solely for AGENT'S use on behalf of COMPANY and which shall remain the property of COMPANY and shall be returned to COMPANY by AGENT immediately upon the termination of his affiliation with COMPANY

    AGENT further agrees that the final statement of his account shall be postponed until after such time as all of the above items are returned to COMPANY. Further, COMPANY shall have the right to retain the sum of $300.00 upon termination of this Agreement and until AGENT has returned all items or property of COMPANY and complied with all other conditions provided for herein.

3.  AGENT hereby acknowledges that the said materials furnished him by COMPANY, or received by AGENT during his affiliation with the COMPANY, and all Catalogs, Prospect Lists, Customer Lists, Customer Information and other information, and the instruction and tutelage which he has and will from time to time receive while affiliated with company are of great value to COMPANY and will be to AGENT, and if misused by AGENT or used or allowed to be used by AGENT for or on behalf of a competitor of COMPANY would cause COMPANY irreparable loss and damage, the extent of which will be substantial but may not be readily capable of determination. The business of COMPANY is established, maintained and continued by providing for customers a dependable source of supply of the products it distributes by means of frequent calling upon customers by its independent sales agents. Said sales agents are COMPANY'S only personal contact with customers and prospective customers.

EXHIBIT

Accordingly, in consideration of COMPANY'S engaging him as an INDEPENDENT AGENT under this Agreement, AGENT hereby agrees as follows:

(a)  During the term of his Agency and for a period of Two (2) Years following termination thereof whether by himself or by COMPANY, for whatever reason and whether for cause or without cause, he shall not, directly or indirectly, for or on behalf of himself or any company or firm in which he has an interest or up which any member of his family has an interest, solicit orders from customers or sell products competitive to those sold by COMPANY to any customer that he solicited or sold on behalf of COMPANY during the last 12 months of his relationship with COMPANY

(b)  AGENT shall not, at any time, or in any place, territory or location disclose to any person, firm, association or corporation other than COMPANY, the names of or any other information concerning any of the customers that he solicited or sold during his relationship with COMPANY or the names of which were furnished to him by COMPANY for such purpose

(c)  AGENT shall not, at any time or in any place, disclose to any person, firm or corporation or permit any of the same to be copied, or in any manner furnish or otherwise make use of the Sales Kit, Manuals, Samples or any other Materials, Merchandise or Advertising Matter furnished him by COMPANY or received by him from COMPANY except as is necessary and appropriate to the solicitation of orders for COMPANY

(d)  During the term hereof and at all times thereafter, AGENT shall not disclose to any person, firm or corporation other than COMPANY any trade information, techniques or other confidential information of the business of COMPANY, its methods of doing business or any information concerning its customers learned or acquired by AGENT during his relationship with COMPANY and shall not engage in any unfair trade practices with respect to COMPANY.

4.  AGENT agrees that in the event of his breach or violation or attempted breach or violation of any of the above provisions, said provisions, or any of them, maybe enforced by an injunction in a suit in equity and that a temporary or preliminary injunction or restraining order may be granted immediately upon the commencement of any such suit and without notice.

5.  (a)  This Agreement shall remain in effect until terminated as hereinafter provided. Either party shall have the right at any time to terminate this Agreement by giving fifteen (15) days prior written notice thereof to the other party.

(b)  COMPANY may cancel and terminate this Agreement by giving two (2) days written notice in the event AGENT shall violate any material provisions of this Agreement which could result in damage to COMPANY or its customer relations or in the event he shall have induced COMPANY to enter into this Agreement by the concealment of material fact or by a material misrepresentation or in the event he shall cease to function on behalf of COMPANY under the terms hereof, or a receiver shall be appointed for him or for his property, or a petition in bankruptcy or for reorganization or for an arrangement shall be filed by or against him or he shall make an assignment for the benefit of creditors. AGENT upon like notice may terminate this Agreement in the event COMPANY shall without legal justification refuse to pay commissions to AGENT. AGENT shall comply promptly with COMPANY'S reasonable requests for information required by the Internal Revenue Service or any other governmental agencies.

(c)  Upon termination of this Agreement, both parties shall be released and relieved of all future liability hereunder, except that:

(i)  AGENT shall immediately return to COMPANY all property described in Paragraph 2 hereof.

(ii)  AGENT shall forthwith pay to COMPANY the excess of any and all advances made to him over and above the amount of commission due and owing to him

(iii)  COMPANY shall pay AGENT for the excess, if any of commission due him over advances or other charges due from AGENT.

(iv)  AGENT shall remain bound by the provisions of Paragraph 2, 3, 4 and 5(c) hereof

6.  This Agreement shall be construed, interpreted and performed in accordance with the laws of the State of Illinois.

7.  It is intended and agreed by and between the parties hereto that AGENT is and shall at all times pertinent hereto be and remain an independent contractor. This agreement is for personal services and shall not be assigned by AGENT without COMPANY'S written consent being first obtained. In the event AGENT shall desire to conduct the business of soliciting orders for the sale of COMPANY'S products through and in the name of a corporation to be organized by AGENT ("Corporation") and with respect to which Corporation, AGENT or AGENT and his spouse will be the sole shareholders, upon reasonable prior written notice to COMPANY, COMPANY will thereupon enter into a new agreement with AGENT substantially in the form hereof which shall contain such additional provisions as may be required to conform to this paragraph 7, and if required by COMPANY, AGENT'S guaranties of performance by Corporation of its undertakings to COMPANY.

8.  All of the covenants and provisions herein contained are severable. In the event that any of said covenants or provisions shall be held invalid by any court of competent jurisdiction, this Agreement shall be construed as if such invalid covenant or provision were not herein contained. The failure to enforce any provision shall not be construed as a waiver of that right or of any other provision or right.

9.  The use of any pronoun herein in the singular or masculine form shall be deemed to include the plural, feminine or neuter form wherever the context would so require.

10. This instrument supersedes all previous agreements between the parties and contains the entire agreement between them, and it is expressly agreed that no representations, promises, conditions, warranties or understandings either expressed or implied, other than herein set forth, shall be binding upon either party, and that none of the provisions of this Agreement shall be waived, altered, or amended, except by writing signed by the President, Vice President, Secretary, Treasurer, or Director of Sales of COMPANY on the one hand and by the AGENT on the other.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

COMPANY

DRUMMOND AMERICAN CORPORATION

By: _____

Its   Executive Vice President-Sales

_____
(Independent Agent)

_____
(Address)

NOTE: See Exhibit 'A', reverse side this page.

## EXHIBIT "A"

In accordance with Paragraph 1.(a) of the foregoing sales agreement the territory of _J. RICHARD_ _STEELE_
 (Independent Agent)

will be as follows:

<u>State(s)</u>    Indiana

<u>Counties</u>   Marion, Morgan, Johnson, Owen, Monroe, Brown, Bartholomew,

Greene, Lawrence, Johnson, And Orange Counties

<u>Exceptions:</u>    Any account assigned to other Drummond American Corporation

agents shall not be part of the above territory.

Effective:   <u>April 1, 1987</u>   _____

This assignment supersedes any and all previous assignments and all amendments and supplements thereto

DRUMMOND AMERICAN CORPORATION

BY: _____

_____
(Independent Agent)



DRUMMOND AMERICAN CORPORATION
INDEPENDENT SALES AGENT'S SECURITY BONUS PROGRAM

I.    Qualifications for Participation.
    A.    Representing Company as an Independent Sales Agent ("Agent") for three (3) full, consecutive, calendar years.
    B.    Total Net Business previous three (3) consecutive, calendar years must aggregate $300,000.00 plus.
    C.    Net business for two (2) of the three (3) consecutive, calendar years counted must exceed $100,000.00 net volume.

The above qualifications are the only ones required for participating in this Program.

II.    The Reward - Continuing Qualification.
    A.    Company will reward the Agent by way of a deferred bonus equaling four percent (4%) of annual net commissions in the manner and subject to the terms explained herein. The reward will commence once the three (3) qualifying requirements have been met. Thereafter, the Company will establish a bonus account for Agent and will credit the account with four percent (4%) of the net commissions paid to Agent with respect to the third calendar year. Subsequently, credits to Agent's bonus account will be made by the Company for each full, calendar year of participation thereafter based upon commissions paid to Agent for that year, provided Agent has represented Company for the entire calendar year, and Agent continues to write the minimum volume of net business required by the company under the Program. Following the end of each calendar year and before any reward is made for that year, if any, interest will be credited against the then vested portion of Agent's bonus account. Interest shall be computed at a rate equal to the average of the one year U.S. Treasury Bill rates in effect as of the 1st day of each calendar quarter during that year.
    B.    If Agent, after becoming a participant, fails to meet the minimum requirements for three (3) consecutive calendar years, his or her participation in the Program will be discontinued. However, Agent will retain an interest in the then vested portion of those amounts previously credited to his or her bonus account.

III.    Payment of Reward.
    A.    Normal Payment. Subject to Section IV, the full amount credited to Agent's bonus account is normally payable to Agent or his or her designated beneficiary following termination of the agency relationship of twenty (20) consecutive, calendar years of participation in the Program. Any Agent continuing in the agency relationship thereafter and continuing as a participant will continue in the Program and subject to Section IV, be fully vested.
    B.    Payment - Less than Full Term. Subject to Section IV, the Agent or his or her designated beneficiary, may obtain the vested amount credited to his or her bonus account before the expiration of twenty (20) consecutive, calendar years of participation in the Program only under the following circumstances and in the following amounts:
        (i)    In the event of death or in the event of total and permanent disability: at any time after qualifying, the entire amount then credited to his or her bonus account.
        (ii)    In the event of termination of agency, either by Agent or by Company for any reason:
            (a)    less than five (5) full, consecutive, calendar years of participation in the Program: zero percent of the amount then credited to his or her bonus account;
            (b)    following completion of five (5) full, consecutive, calendar years' participation in the Program: twenty-five percent (25%) of the amount credited to his or her bonus account;
            (c)    for each full, calendar year's participation in the Program thereafter, five percent (5%) additional (i.e. 6 years, 30%; 7 years, 35%; 10 years, 50%; and 20 years, 100%).
        (iii)    In the event age 65 is reached by the Agent and the agency is thereafter terminated by either party for any reason before completing twenty (20) years of participation in the Program:
            (a)    Until completion of ten (10) years of participation in the Program, regular schedule will apply (i.e. 25% after five (5) years participation, etc.).
            (b)    After completion of not less than ten (10) years participation in the Program, the entire amount then credited to Agent's bonus account will become payable.

IV.    Forfeiture of Reward.
    A.    In the event of termination of the agency relationship by either party for any reason when participation in the Program is less than five (5) full, consecutive, calendar years, or in the event of termination of the agency relationship at any time (regardless of length of participation in the Program) for conduct inimical to the best interests of Company: Zero percent of amounts credited to his or her bonus account shall be payable to Agent or his or her beneficiary and the entire amount credited to the bonus account shall be forfeited.
    B.    In the event of termination of the agency relationship, for any reason and at any time, any amounts credited to Agent's bonus account not payable hereunder shall be forfeited.

V.    Method of Payment.
Payment by the company will be in a lump sum. All payments to participants from the security bonus plan are taxable as ordinary income for the year in which payment is made. Payments from the security bonus plan DO NOT qualify for tax-deferred roll over to an individual retirement account (IRA) or any other qualified retirement plan.

VI.    Voluntary Program - Reserved Rights.
This is a voluntary program on the part of the Company in an effort to give you and your family peace of mind and security for the future and to provide you with the finest agency relationship in the industry. To the best of our knowledge, this program has never been attempted in our industry (or any other) for the benefit of independent sales agents and therefore, Company reserves the right to withdraw or modify this Program at any future date in the event Company deems it appropriate, or if requested by any duly constituted body or agency of the United States or any state or local government. However, if any of these events should take place, reasonable notice would be given by Company to all participants, and any vested amounts then reflected in Agent's bonus account would be paid in accordance with the terms of payment under the Program.

EXHIBIT
G
tabbies®

# SALES AGENTS' SECURITY BONUS PROGRAM - 2005

The following is a statement of your activity and interest
on vested balances in the Security Bonus Program for the year ended
December 31, 2005:

| | |
|---|---|
| PARTICIPANT | *RICHARD STEELE* |
| COMPANY NUMBER | 7 |
| REGION NUMBER | 17 |
| YEAR ENTERED INTO PROGRAM | 1990 |
| BALANCE AS OF 12-31-04 | 40,621.85 |
| VESTED PORTION AS OF 12-31-04 | 30,466.39 |
| INTEREST ON VESTED PORTION AS OF 12-31-04 (3.43%) | 1,045.00 |
| 2005 NET COMMISSIONS | 49,904.94 |
| COMPANY CONTRIBUTION AT 4% | 1,996.20 |
| BALANCE AS OF 12-31-05 | 43,663.04 |
| YEARS OF PROGRAM PARTICIPATION | 16 |
| PERCENT VESTED | 80% |
| VESTED PORTION OF 12-31-05 BALANCE | $34,930.43 |



EXHIBIT

tabbies

H

**

## DRUMMOND AMERICAN CORPORATION
### INDEPENDENT SALES AGENT'S SECURITY BONUS PROGRAM

I.    Qualifications for Participation.
    A.    Representing Company as an Independent Sales Agent ("Agent") for three (3) full, consecutive, calendar years.
    B.    Total Net Business previous three (3) consecutive, calendar years must aggregate $300,000.00 plus.
    C.    Net business for two (2) of the three (3) consecutive, calendar years counted must exceed $100,000.00 net volume.

The above qualifications are the only ones required for participating in this Program.

II.    The Reward - Continuing Qualification.
    A.    Company will reward the Agent by way of a deferred bonus equaling four percent (4%) of annual net commissions in the manner and subject to the terms explained herein. The reward will commence once the three (3) qualifying requirements have been met. Thereafter, the Company will establish a bonus account for Agent and will credit the account with four percent (4%) of the net commissions paid to Agent with respect to the third calendar year. Subsequently, credits to Agent's bonus account will be made by the Company for each full, calendar year of participation thereafter based upon commissions paid to Agent for that year, provided Agent has represented Company for the entire calendar year, and Agent continues to write the minimum volume of net business required by the company under the Program. Following the end of each calendar year and before any reward is made for that year, if any, interest will be credited against the then vested portion of Agent's bonus account. Interest shall be computed at a rate equal to the average of the one year U.S. Treasury Bill rates in effect as of the 1st day of each calendar quarter during that year.
    B.    If Agent, after becoming a participant, fails to meet the minimum requirements for three (3) consecutive calendar years, his or her participation in the Program will be discontinued. However, Agent will retain an interest in the then vested portion of those amounts previously credited to his or her bonus account.

III.    Payment of Reward.
    A.    Normal Payment. Subject to Section IV, the full amount credited to Agent's bonus account is normally payable to Agent or his or her designated beneficiary following termination of the agency relationship after twenty (20) consecutive, calendar years of participation in the Program. Any Agent continuing in the agency relationship thereafter and continuing as a participant will continue in the Program and subject to Section IV, be fully vested.
    B.    Payment - Less than Full Term. Subject to Section IV, the Agent or his or her designated beneficiary, may obtain the vested amount credited to his or her bonus account before the expiration of twenty (20) consecutive, calendar years of participation in the Program only under the following circumstances and in the following amounts:
      (i)    In the event of death or in the event of total and permanent disability: at any time after qualifying, the entire amount then credited to his or her bonus account.
      (ii)    In the event of termination of agency, either by Agent or by Company for any reason:
          (a)    less than five (5) full, consecutive, calendar years of participation in the Program: zero percent of the amount then credited to his or her bonus account;
          (b)    following completion of five (5) full, consecutive, calendar years' participation in the Program: twenty-five percent (25%) of the amount credited to his or her bonus account;
          (c)    for each full, calendar year's participation in the Program thereafter, five percent (5%) additional (i.e. 6 years, 30%; 7 years, 35%; 10 years, 50%; and 20 years, 100%).
      (iii)    In the event age 65 is reached by the Agent and the agency is thereafter terminated by either party for any reason before completing twenty (20) years of participation in the Program:
          (a)    Until completion of ten (10) years of participation in the Program, regular schedule will apply (i.e. 25% after five (5) years participation, etc.).
          (b)    After completion of not less than ten (10) years participation in the Program, the entire amount then credited to Agent's bonus account will become payable.

IV.    Forfeiture of Reward.
    A.    In the event of termination of the agency relationship by either party for any reason when participation in the Program is less than five (5) full, consecutive, calendar years, or in the event of termination of the agency relationship at any time (regardless of length of participation in the Program) for conduct inimical to the best interests of Company: Zero percent of amounts credited to his or her bonus account shall be payable to Agent or his or her beneficiary and the entire amount credited to the bonus account shall be forfeited.
    B.    In the event of termination of the agency relationship, for any reason and at any time, any amounts credited to Agent's bonus account not payable hereunder shall be forfeited.

V.    Method of Payment.
Payment by the company will be in a lump sum. All payments to participants from the security bonus plan are taxable as ordinary income for the year in which payment is made. Payments from the security bonus plan DO NOT qualify for tax-deferred roll over to an individual retirement account (IRA) or any other qualified retirement plan.

VI.    Voluntary Program - Reserved Rights.
This is a voluntary program on the part of the Company in an effort to give you and your family peace of mind and security for the future and to provide you with the finest agency relationship in the industry. To the best of our knowledge, this program has never been attempted in our industry (or any other) for the benefit of independent sales agents and therefore, Company reserves the right to withdraw or modify this Program at any future date in the event Company deems it appropriate, or if requested by any duly constituted body or agency of the United States or any state or local government. However, if any of these events should take place, reasonable notice would be given by Company to all participants, and any vested amounts then reflected in Agent's bonus account would be paid in accordance with the terms of payment under the Program.

EXHIBIT
I

# SALES AGENTS' SECURITY BONUS PROGRAM - 2005

The following is a statement of your activity and interest
on vested balances in the Security Bonus Program for the year ended
December 31, 2005:

| | |
|---|---|
| PARTICIPANT | *KURT WISE* |
| COMPANY NUMBER | 7 |
| REGION NUMBER | 17 |
| YEAR ENTERED INTO PROGRAM | 2001 |
| BALANCE AS OF 12-31-04 | 5,189.27 |
| VESTED PORTION AS OF 12-31-04 | 0.00 |
| INTEREST ON VESTED PORTION AS OF 12-31-04 (3.43%) | 0 |
| 2005 NET COMMISSIONS | 37,331.25 |
| COMPANY CONTRIBUTION AT 4% | 1,493.25 |
| BALANCE AS OF 12-31-05 | 6,682.52 |
| YEARS OF PROGRAM PARTICIPATION | 5 |
| PERCENT VESTED | 25% |
| ( VESTED PORTION OF 12-31-05 BALANCE ) | $1,670.63 |



EXHIBIT

tabbies

# HINSHAW
& C U L B E R T S O N   L L P

June 5, 2007

**ATTORNEYS AT LAW**
222 North LaSalle Street
Suite 300
Chicago, IL 60601-1081

312-704-3000
312-704-3001 (fax)
www.hinshawlaw.com

**U.S. MAIL**
    **and**
**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

James S. Shore
207 Fordham Way
Knoxville, Tennessee  37934-3840

Dear Mr. Shore:

We represent Drummond American Corporation ("Drummond") and are writing to you on its behalf.

On February 17, 1997 you entered into a contract in which you agreed to certain restrictions on your business activities after you ended your business relationship with Drummond. A copy of your contract is enclosed for your reference.

We have been advised that your relationship with Drummond was terminated effective April 4, 2007, and that you are now affiliated with Continental Research and with Water Science Services, Inc., both of which are direct competitors of Drummond. It is Drummond's understanding that you have breached the terms of your contract by soliciting customers with which you dealt on behalf of Drummond and selling them products competitive to those you sold for Drummond. Additionally, it is Drummond's understanding that you are using and divulging customer, price and other confidential information furnished to you by Drummond or learned during your business relationship with Drummond on behalf of Continental Research and yourself. By your conduct, you have breached your written contract with Drummond and have violated the Uniform Trade Secrets Act.

Under the terms of your contract, you are prohibited for two (2) years, until April 4, 2009, from soliciting purchases of products competitive to Drummond's from, and selling of products competitive to Drummond's to, those Drummond customers you solicited or sold to during the year prior to your termination. In addition, you are prohibited at all times from using or disclosing any of Drummond's customer and other confidential information on behalf of yourself or any other person or entity, including Continental Research.



EXHIBIT
K

James S. Shore
June 5, 2007
Page 2

You also agreed in your contract with Drummond that you would not at any time induce, cause or encourage any other agent or employee of Drummond to leave Drummond to compete with Drummond or to breach a contract with Drummond.

On behalf of Drummond, demand is hereby made that you immediately cease and desist all activities in violation of your contract and in all respects comply with the terms and conditions of your contract with Drummond. If you fail to do so, Drummond will take all appropriate action to enforce its contractual and statutory rights and to protect its business interests.

Sincerely,

HINSHAW & CULBERTSON LLP

Alan I. Greene
Direct 312-704-3536
agreene@hinshawlaw.com

AIG:pj
Enclosure

cc:  Thomas W. Epstein, Continental Research Corporation c/o Scott D. Levine, Esq.
     Nick Vassallo (via e-mail)



# AGREEMENT WITH INDEPENDENT
# SALES AGENT

 – 1

THIS AGREEMENT is made and entered into at ___VERNON HILLS, ILLINOIS_____ this __17TH__ day of ____FEBRUARY___, 19 97 by and between Drummond American Corporation ("COMPANY"), a corporation of Illinois and JAMES S. SHORE_____, independent sales agent ("AGENT").

COMPANY is engaged in the sale and distribution of disinfectants, deodorants, soaps, detergents, cleaners, hand cleaners, paints, insecticides, chemical specialties, maintenance chemicals, degreasers, and floor maintenance materials and equipment, as well as related products, materials and equipment, as more particularly described in COMPANY'S Sales Kit and Manuals.

COMPANY sells the products it distributes through independent sales agents who, as independent contractors, solicit orders subject to COMPANY'S acceptance and maintain, on behalf of COMPANY, frequent contacts for said purpose with customers.

AGENT has made application to COMPANY to become an independent sales agent or desires to continue to serve COMPANY as an independent sales agent and COMPANY desires to appoint or continue the appointment of AGENT as its independent sales representative.

NOW THEREFORE, in recognition of the needs of COMPANY, its employees and other of its independent sales agents, and in consideration of AGENT becoming or continuing as an independent sales agent on behalf of COMPANY and the mutual agreements and undertakings herein set forth, it is agreed as follows:

1.   (a)    COMPANY hereby appoints AGENT as its Independent Sales Agent upon the terms set forth herein and within the territory described in Exhibit "A" made a part hereof (or in such other territory as may be designated from time to time by COMPANY and agreed to by AGENT). AGENT hereby accepts such appointment and, as a fiduciary hereunder, agrees to use his best efforts on behalf of COMPANY in the performance of his duties and obligations under this Agreement, to at all times conduct himself in a manner reflecting credit upon himself and COMPANY and to refrain from any acts which are inimical to the best interests of COMPANY.

    (b)    All orders solicited by AGENT shall be forwarded promptly to COMPANY by AGENT and are subject to acceptance by COMPANY at COMPANY'S office. COMPANY may accept or reject any order, cancel any order, accept such returns of merchandise from customers and grant such allowances to customers as it shall deem proper.

    (c)    (i)    For the solicitation of orders and for the goodwill developed on behalf of COMPANY through performance of AGENT'S duties and obligations hereunder, AGENT shall be paid a commission on orders solicited by AGENT from Active Accounts (as hereinafter defined) of AGENT and accepted by COMPANY. Commissions shall be payable at the rates fixed by COMPANY and in effect at the time of acceptance of each order by COMPANY. Commissions shall be paid on the 15th and the last day of each month on net sales shipped to the Account through the end of the previous month or through the 15th of the current month, respectively, subject to deductions for uncollected items, charge-backs, returned merchandise and any obligations initiated by AGENT. COMPANY may change said commission payment schedule, including rates and deductions, at any time and from time to time after having given prior notice thereof to AGENT.

            (ii)    Active Accounts of AGENT shall mean accounts assigned to AGENT by COMPANY and new accounts (not Active Accounts of other agents) solicited by AGENT; provided that AGENT solicits an order from the new account within ninety (90) days of such solicitation or within ninety (90) days of a request by COMPANY or a District Manager to call on the new account.

            (iii)    Each Active Account of AGENT shall remain the account of AGENT unless the Active Account becomes an Inactive Account. An Active Account becomes an Inactive Account when AGENT: (1) dies; (2) becomes permanently disabled; (3) retires; (4) changes territory or accounts at the request of either party hereto with mutual written consent between AGENT and COMPANY; (5) terminates (or COMPANY terminates) the independent sales agent relationship with COMPANY; (6) fails to obtain an order from an account that is accepted by the COMPANY within one hundred eighty (180) days of a previously accepted order; or (7) the Active Account of AGENT refuses to continue ordering COMPANY products through AGENT or requests that another independent sales agent be assigned to his account. Inactive Accounts may be assigned by COMPANY to another independent sales agent at any time.

    (d)    All expenses of AGENT for travel, insurance, transportation, use of facilities or equipment and all other expenses of every nature shall be paid by AGENT without reimbursement by COMPANY.

    (e)    AGENT shall carry, at his own expense, public liability insurance in limits of liability of not less than the following: property damage, $100,000; bodily injury having limits of $250,000/$500,000 in connection with the use of any vehicle used by AGENT in connection with his work under this Agreement and shall furnish COMPANY with a certificate of such insurance designating COMPANY as an additional insured which shall not be subject to cancellation without giving COMPANY 30 days prior written notice.

    (f)    AGENT has no authority to and shall not obligate or bind COMPANY in any manner.

2.   COMPANY has loaned to AGENT a Sales Kit, Manuals, Samples, Catalogs and other materials, Merchandise and Advertising Matter and Equipment. These, together with all Confidential Information and Trade Secrets (defined below) are solely for AGENT'S use on



EXHIBIT

AGENT further agrees that the final settlement of his account shall be postponed until after such time as all of the above items are returned to COMPANY. Further, COMPANY shall have the right to retain the sum of $300 upon termination of this Agreement and until AGENT has returned all items of property of COMPANY, settlement of then existing accounts has been made, and AGENT has complied with all other conditions provided for herein.

3.    AGENT hereby acknowledges, understands and agrees:



(a)    The Sales Kit, Manuals, Samples, Catalogs and other materials furnished to him by COMPANY (or received by AGENT during his affiliation with COMPANY) and all Confidential Information and Trade Secrets (defined below) and other information (including, but not limited to, the instruction and tutelage) which he has and will from time to time receive, learn, develop, assemble, prepare, maintain, accumulate or acquire while affiliated with COMPANY are of great value and are confidential to COMPANY and will be to AGENT and, if misused by AGENT or used or allowed to be used by AGENT for or on behalf of a competitor of COMPANY, would cause COMPANY irreparable loss and damage, the extent of which will be substantial but may not be readily capable of determination.

(b)    COMPANY considers and AGENT hereby agrees that the Sales Kit, Manuals, Prospect Lists, Customer Lists, call reports, customer history record cards (whether produced by COMPANY or AGENT in connection with his engagement hereunder), computer summaries of AGENT'S and customers' purchasing activities, purchase orders, invoices, Customer Information (defined below), instruction and tutelage are Confidential Information and Trade Secrets of COMPANY ("Confidential Information and Trade Secrets"), and AGENT agrees to maintain their confidentiality, to follow all COMPANY procedures to maintain their confidentiality and to keep all Confidential Information and Trade Secrets in a safe place at all times.

(c)    The business of COMPANY is established, maintained and continued by providing for customers a dependable, regular, consistent and long term source of supply of the products it distributes by means of frequent and consistently recurring personal calling upon customers by its independent sales agents and their becoming familiar with Customer Information including, but not limited to, the purchasing agents or buyers, the nature of the business, particular purchasing requirements and habits, stocking requirements, product applications, uses and preferences, prices paid for particular products, practices and procedures of customers and prospective customers ("Customer Information"). Said independent sales agents are COMPANY'S only personal contact with customers and prospective customers. AGENT would not have such contact with customers and prospective customers but for his performing, as a fiduciary, his duties and obligations hereunder.

(d)    Accordingly, in consideration of COMPANY's engaging him or continuing to engage him as an INDEPENDENT SALES AGENT under this Agreement, AGENT hereby agrees as follows:

(i)    During the term of his independent sales agency hereunder and for a period of two (2) years following termination thereof, whether by himself or by COMPANY, for whatever reason and whether for cause or without cause, AGENT shall not, directly or indirectly, for or on behalf of himself or any person, firm or entity solicit orders from or sell to any customer whom or which he solicited or sold on behalf of COMPANY during the last twelve (12) months of his relationship with COMPANY, any products competitive to those distributed by COMPANY. Products competitive to those distributed by COMPANY are those which are substantially similar to or serve substantially similar functions as those products listed in COMPANY'S Sales Kit, Catalogs and Manuals furnished to AGENT from time to time.

(ii)    During the term of his independent sales agency hereunder and for a period of two (2) years following termination thereof, whether by himself or by COMPANY, for whatever reason and whether for cause or without cause, AGENT shall not disclose to any person, firm or entity other than COMPANY or otherwise make use of or, through failure to exercise due care and diligence, cause or permit the unauthorized use of the names, Customer Information, or any other information concerning any of the customers that he solicited or sold during his affiliation with COMPANY, whether such names, Customer Information or other information were furnished to him by COMPANY or developed by him in the course of his affiliation with COMPANY.

(iii)    AGENT shall not, at any time or in any place, disclose to any person, firm or entity or permit any of the same to be copied or in any manner furnish or otherwise make use of the Confidential Information and Trade Secrets or any other materials, Merchandise or Advertising Matter furnished to or received by him from COMPANY or assembled or compiled by him in the course of his affiliation with COMPANY, except as is necessary and appropriate to the solicitation of orders for COMPANY.

(iv)    During the term of his independent sales agency hereunder and at all times thereafter, AGENT shall not disclose to any person, firm or entity other than COMPANY any techniques of the business of COMPANY or its methods of doing business learned or acquired by AGENT during his affiliation with COMPANY, or any other Confidential Information or Trade Secrets of COMPANY.

(v)    During the term of his independent sales agency hereunder and at all times thereafter, AGENT shall not, either directly or indirectly, enter into an agreement with or solicit independent sales agents or employees of COMPANY for the purpose of inducing, causing or encouraging them to terminate their business relationships with COMPANY and enter into activities competitive with those of COMPANY or breach any agreements they may have with COMPANY.

(vi)    During the term of his independent sales agency hereunder and at all times thereafter, AGENT shall not engage in any unfair trade practices with respect to COMPANY.

4.    AGENT agrees that in the event of his breach or violation or attempted breach or violation of any of the provisions of Paragraph 3 hereof, in addition to all other remedies, said provisions, or any of them, may be enforced by an injunction, and that a temporary restraining order or preliminary injunction may be granted immediately upon the

5.  (a)  AGENT'S independent sales agency hereunder shall remain in effect until terminated as hereinafter provided. Either party shall have the right at any time to terminate AGENT's independent sales agency hereunder by giving fifteen (15) days prior written notice thereof to the other party.

(b)  COMPANY may terminate AGENT'S independent sales agency hereunder by giving two (2) days prior written notice thereof to AGENT in the event AGENT shall violate any material provision of this Agreement which could result in damage to COMPANY or its customer relations or in the event AGENT shall have induced COMPANY to enter into this Agreement by the concealment of material fact or by material misrepresentation, or in the event AGENT shall cease to function on behalf of COMPANY under the terms hereof, or a receiver shall be appointed for AGENT or for AGENT's property, or a petition in bankruptcy or for reorganization or for an arrangement shall be filed by or against AGENT, or AGENT shall make an assignment for the benefit of creditors. AGENT, upon like notice, may terminate his independent sales agency hereunder in the event COMPANY shall refuse to pay commissions to AGENT without legal justification.

(c)  Upon termination of AGENT'S independent sales agency, each party shall be released and relieved of all future liability hereunder, except that:

   (i)  AGENT shall immediately return to COMPANY all property described in Paragraph 2 hereof.

   (ii)  AGENT shall forthwith pay to COMPANY the excess of any and all advances made and charge-backs attributable to him, over and above the amount of commission due and owing to him.

   (iii)  COMPANY shall pay AGENT, at final settlement date, for the excess, if any, of commission due him over advances or other charges due from AGENT.

   (iv)  AGENT shall remain bound by the provisions of Paragraphs 2, 3 and 4 in their entirety and Paragraph 5(c) hereof.

6.  This Agreement shall be construed, interpreted and performed in accordance with the laws of the State of __ILLINOIS__.

7.  It is intended and agreed by and between the parties hereto that AGENT is and shall at all times pertinent hereto be and remain an independent contractor and not an employee. AGENT understands and agrees that AGENT shall not be considered to be an employee for purposes of Federal income tax withholding and, unless otherwise specifically provided by law, for purposes of the Federal Insurance Contributions Act, the Social Security Act or the Federal Unemployment Tax Act, and for purposes of benefits provided to employees of COMPANY under any employee benefit plan. AGENT understands and agrees that as an independent contractor, AGENT is required to pay Federal Self-Employment Tax and Federal Income Tax on the commissions paid to AGENT and may be required to pay quarterly estimated income taxes. It is understood that COMPANY will report the income earned by AGENT to the Internal Revenue Service on Form 1099. AGENT shall comply promptly with COMPANY'S reasonable requests for information required by the Internal Revenue Service or any other governmental agency.

8.  This Agreement is for personal services and shall not be assigned by AGENT without COMPANY's written consent being first obtained. In the event AGENT shall desire to conduct the business of soliciting orders for the sale of COMPANY'S products through and in the name of a corporation to be organized by AGENT ("Corporation") and with respect to which Corporation, AGENT or AGENT and his spouse will be the sole shareholders, upon reasonable prior written notice to COMPANY, COMPANY will thereupon enter into a new agreement with AGENT substantially in the form hereof which shall contain such additional provisions as may be required to conform to this Paragraph 8 and, if required by COMPANY, AGENT'S guaranties of performance by Corporation of its undertakings to COMPANY.

9.  All of the covenants and provisions herein contained are severable. In the event that any of said covenants or provisions shall be held invalid by any court of competent jurisdiction, this Agreement shall be construed as if such invalid covenant or provision were not herein contained. In the event that any covenant or provision of Paragraph 3 of this Agreement is broader or of greater scope as to time, territory, products or customers than any court of competent jurisdiction will enforce, the parties hereto intend that such court may enforce such covenants and provisions to the greatest extent permitted by law and modify such covenants and provisions accordingly. The failure to enforce any provision shall not be construed as a waiver of that right or of any other provision or right.

10.  The use of any pronoun herein in the singular or masculine form shall be deemed to include the plural, feminine or neuter form wherever the context would so require.

11.  This instrument supersedes all previous agreements between the parties and contains the entire agreement between them, and it is expressly agreed that no representations, promises, conditions, warranties or understandings, either expressed or implied, other than herein set forth, shall be binding upon either party, and that none of the provisions of this Agreement shall be waived, altered, or amended, except by writing signed solely by any one of the following: Chairman of the Board, Chairman of the Executive Committee, President, Vice President of Sales or National Sales Manager of COMPANY on the one hand and by the AGENT on the other.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

AGENT:

_____

ADDRESS:

Jim Shore

COMPANY:

DRUMMOND AMERICAN CORPORATION

By: _____

Its:  VICE PRESIDENT, SALES

**EXHIBIT "A"**

In accordance with Paragraph 1.(a) of the foregoing sales agreement, the geographic area therein referred to as "territory" assigned to

<u>JAMES S. SHORE</u> on a non-exclusive basis shall be as follows:

       (Independent Sales Agent)

<u>State(s)</u>    TENNESSEE

<u>Counties</u>    KNOX, ANDERSON, AND BLOUNT COUNTIES IN TENNESSEE

        Scott, Loudon

<u>Exceptions:</u> ACCOUNTS SERVICED BY OTHER DRUMMOND AMERICAN CORPORATION INDEPENDENT SALES AGENTS.

<u>Effective:</u>  <u>FEBRUARY 17, 1997</u>

This assignment supersedes any and all previous assignments and all amendments and supplements thereto.

AGENT:                            DRUMMOND AMERICAN CORPORATION

                                    By:

      (Independent Sales Agent)



DRUMMOND AMERICAN CORPORATION
INDEPENDENT SALES AGENT'S SECURITY BONUS PROGRAM

I.  Qualifications for Participation.
   A.  Representing Company as an Independent Sales Agent ("Agent") for three (3) full, consecutive, calendar years.
   B.  Total Net Business previous three (3) consecutive, calendar years must aggregate $300,000.00 plus.
   C.  Net business for two (2) of the three (3) consecutive, calendar years counted must exceed $100,000.00 net volume.

   The above qualifications are the only ones required for participating in this Program.

II.  The Reward - Continuing Qualification.
   A.  Company will reward the Agent by way of a deferred bonus equaling four percent (4%) of annual net commissions in the manner and subject to the terms explained herein. The reward will commence once the three (3) qualifying requirements have been met. Thereafter, the Company will establish a bonus account for Agent and will credit the account with four percent (4%) of the net commissions paid to Agent with respect to the third calendar year. Subsequently, credits to Agent's bonus account will be made by the Company for each full, calendar year of participation thereafter based upon commissions paid to Agent for that year, provided Agent has represented Company for the entire calendar year, and Agent continues to write the minimum volume of net business required by the company under the Program. Following the end of each calendar year and before any reward is made for that year, if any, interest will be credited against the then vested portion of Agent's bonus account. Interest shall be computed at a rate equal to the average of the one year U.S. Treasury Bill rates in effect as of the 1st day of each calendar quarter during that year.
   B.  If Agent, after becoming a participant, fails to meet the minimum requirements for three (3) consecutive calendar years, his or her participation in the Program will be discontinued. However, Agent will retain an interest in the then vested portion of those amounts previously credited to his or her bonus account.

III.  Payment of Reward.
   A.  Normal Payment. Subject to Section IV, the full amount credited to Agent's bonus account is normally payable to Agent or his or her designated beneficiary following termination of the agency relationship after twenty (20) consecutive, calendar years of participation in the Program. Any Agent continuing in the agency relationship thereafter and continuing as a participant will continue in the Program and subject to Section IV, be fully vested.
   B.  Payment - Less than Full Term. Subject to Section IV, the Agent or his or her designated beneficiary, may obtain the vested amount credited to his or her bonus account before the expiration of twenty (20) consecutive, calendar years of participation in the Program only under the following circumstances and in the following amounts:
      (i)  In the event of death or in the event of total and permanent disability: at any time after qualifying, the entire amount then credited to his or her bonus account.
      (ii)  In the event of termination, either by Agent or by Company for any reason:
         (a)  less than five (5) full, consecutive, calendar years of participation in the Program: zero percent of the amount then credited to his or her bonus account;
         (b)  following completion of five (5) full, consecutive, calendar years' participation in the Program: twenty-five percent (25%) of the amount credited to his or her bonus account;
         (c)  for each full, calendar year's participation in the Program thereafter, five percent (5%) additional (i.e. 6 years, 30%; 7 years, 35%; 10 years, 50%; and 20 years, 100%).
      (iii)  In the event age 65 is reached by the Agent and the agency is thereafter terminated by either party for any reason before completing twenty (20) years of participation in the Program:
         (a)  Until completion of ten (10) years of participation in the Program, regular schedule will apply (i.e. 25% after five (5) years participation, etc.).
         (b)  After completion of not less than ten (10) years participation in the Program, the entire amount then credited to Agent's bonus account will become payable.

IV.  Forfeiture of Reward.
   A.  In the event of termination of the agency relationship by either party for any reason when participation in the Program is less than five (5) full, consecutive, calendar years, or in the event of termination of the agency relationship at any time (regardless of length of participation in the Program) for conduct inimical to the best interests of Company: Zero percent of amounts credited to his or her bonus account shall be payable to Agent or his or her beneficiary and the entire amount credited to the bonus account shall be forfeited.
   B.  In the event of termination of the agency relationship, for any reason and at any time, any amounts credited to Agent's bonus account not payable hereunder shall be forfeited.

V.  Method of Payment.
   Payment by the company will be in a lump sum. All payments to participants from the security bonus plan are taxable as ordinary income for the year in which payment is made. Payments from the security bonus plan DO NOT qualify for tax-deferred roll over to an individual retirement account (IRA) or any other qualified retirement plan.

VI.  Voluntary Program - Reserved Rights.
   This is a voluntary program on the part of the Company in an effort to give you and your family peace of mind and security for the future and to provide you with the finest agency relationship in the industry. To the best of our knowledge, this program has never been attempted in our industry (or any other) for the benefit of independent sales agents and therefore, Company reserves the right to withdraw or modify this Program at any future date in the event Company deems it appropriate, or if requested by any duly constituted body or agency of the United States or any state or local government. However, if any of these events should take place, reasonable notice would be given by Company to all participants, and any vested amounts then reflected in Agent's bonus account would be paid in accordance with the terms of payment under the Program.

EXHIBIT

M